**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ACCU-SPEC ELECTRONIC SERVICES, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 03-394 Erie |
| | ) | |
| CENTRAL TRANSPORT INTERNATIONAL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, J.

Presently pending before the Court is the Defendant, Central Transport International, Inc.'s Motion for Summary Judgment.

**I. BACKGROUND**

Plaintiff, Accu-Spec Electronic Services, Inc. ("Accu-Spec"), is a Pennsylvania corporation with its principal place of business in McKean, Pennsylvania. (Complaint ¶ 1). In the course of its business, Accu-Spec purchased an x-ray machine from Dage Precision Industries ("Dage") of Fremont, California. In January of 2003, Accu-Spec engaged Logistics Plus, Inc. ("Logistics Plus") to transport a crate containing the x-ray machine from Dage to Accu-Spec's facilities in McKean. (Complaint ¶ 6; Appx. Ex. A). Logistics Plus, a New York corporation, offers a full range of logistics services including freight forwarding and shipment consolidation. (See Logistics Plus website, Appx. Ex. F; Complaint ¶ 3). Indeed, Logistics Plus is licensed as an international freight forwarder. Id.

After agreeing with Accu-Spec upon a rate for transportation of the machine, Logistics Plus issued its own bill of lading setting forth the terms governing the shipment of the machine from Fresno to McKean. (Logistics' Answer ¶¶ 29, 38; Appx. Ex. B, C and D). Logistics Plus then entered into an agreement with a carrier, Defendant Central Transport Internation, Inc. ("Central"), to physically transport the machine from origin to destination. (Complaint ¶ 7; Appx. Ex. D). In the course of negotiating the transport of the machine, Accu-Spec and Central both dealt exclusively with Logistics Plus. (George Horetsky Affidavit ("Horetzky Aff.") ¶ 6; Appx. Ex. E).

Central picked up the x-ray machine from Dage on February 5, 2003, and delivered it to Accu-Spec's facility on February 14, 2003.  (Complaint ¶¶ 8-9; Apps. Ex. A).  Upon arrival and inspection, Accu-Spec immediately noticed that the crate containing the x-ray machine was damaged. (Complaint ¶ 15).  A subsequent inspection by an independent investigator confirmed that the x-ray machine had been damaged.  (Complaint ¶ 17).  After filing claims with both Central and Logistics Plus, Accu-Spec filed the instant suit seeking damages under 49 U.S.C. § 14704 and § 14706.

On October 14, 2004, Central filed the instant motion for summary judgment.  On November 15, 2004, Accu-Spec and Logistics Plus filed briefs in opposition.  On November 30, 2004, Central filed a responsive brief.  This issue is thus ripe for resolution.

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  In order to withstand a motion for summary judgment, the non-moving party must "make a showing sufficient to establish the existence of [each] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In evaluating whether the non-moving party has established each necessary element, the Court must grant all reasonable inferences from the evidence to the non-moving party.  Knabe v. Boury Corp., 114 F.3d 407, 410, n.4 (3d Cir. 1997) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986)).  "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Id.  (quoting Matsushita, 475 U.S. at 587).

## III. DISCUSSION

### A.    49 U.S.C. § 14706

In 1906, Congress codified common law principles relating to the liability of interstate carriers in the Carmack Amendment to the Interstate Commerce Act.  See Tokio Marine & Fire Ins. Co v. Amato Motors, Inc., 996 F.2d 874, 876 (7th Cir. 1993).  Effective January 1, 1996, the Carmack Amendment was recodified as part of the Interstate Commerce Commission Termination

2

Act of 1995, 49 U.S.C. §§ 11706 and 14706.  Section 14706 governs the liability of motor carriers and freight forwarders for freight loss or damage:

> **(a) General Liability -**
>
>> **(1) Motor carriers and freight forwarders.** –A carrier providing transportation of service subject to jurisdiction under subchapter I or III of chapter 135 shall issue a receipt or bill of lading for property received for transportation under this part.  That carrier and any other carrier that delivers the property and is providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 or chapter 105 are liable to the person entitled to recover under the receipt or bill of lading.  The liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States . . .
>>
>> \*  \*  \*  \*  \*  \*  \*  \*  \*
>>
>> Failure to issue a receipt or bill of lading does not affect the liability of a carrier.  A delivering carrier is deemed to be the carrier performing the line-haul transportation nearest the destination but does not include a carrier providing only a switching service at the destination.

49 U.S.C. § 14706(a)(1).

Consistent with this section, there are generally two parties against whom a claim for freight damage can be brought: (1) the carrier that issues the bill of lading, and (2) the "delivering carrier" that physically drops the goods off at the final shipping destination.  Id.  See also S.C. Johnson & Son v. Louisville & Nashville Railroad Co., 695 F.2d 253, 256-57 (7th Cir. 1982) ("To claim the benefits of the Carmack Amendment a shipper must sue either the carrier issuing the bill of lading or the carrier delivering the goods to the final destination.").  The statute further specifies that a claim against either of those parties can encompass damage caused by *any* of the carriers used to transport the freight.  49 U.S.C. § 14706(a)(1). See also S.C. Johnson, 695 F.2d at 256-57; Tokio Marine & Fire Ins. Group v. J.J. Phoenix Exp., 156 F.Supp.2d 889, 894 (N.D. Ill. 2001) (noting that "a shipper is entitled to relief from either the carrier issuing the bill of lading or the carrier delivering the goods to the final destination (either of these carriers will be liable for loss caused by any carrier used during the trip); and then, the carrier held liable to the shipper may, in turn, seek recovery from the carrier, which was responsible for the loss.").   In this manner, the Carmack Amendment seeks to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods."  Reider v. Thompson, 339 U.S. 113,

119 (1950).

When freight is shipped with the assistance of a "freight forwarder," the Carmack Amendment provides additional standards. A freight forwarder is an entity that collects several small shipments of cargo from various shippers, charges each of them a rate for transport from shipping point to destination, and then profits by consolidates the cargos to combine costs.[1] See Chicago, Milwaukee, St. Paul & Pac. R. Co. et al. v. Acme Fast Freight, Inc., 336 U.S. 465, 484-85 (1949). Section 14706(a)(2) of the Carmack Amendment provides that:

> A freight forwarder is both the receiving and delivering carrier. When a freight forwarder provides service and uses a motor carrier providing transportation subject to jurisdiction under subchapter I of chapter 135 to receive property from a consignor, the motor carrier may execute the bill of lading or shipping receipt for the freight forwarder with its consent. With the consent of the freight forwarder, a motor carrier may deliver property for a freight forwarder on the freight forwarder's bill of lading, freight bill, or shipping receipt to the consignee named in it, and receipt for the property may be made on the freight forwarder's delivery receipt.

49 U.S.C. § 14706(a)(2). The United States Supreme Court described the common law principles pertaining to a freight forwarder's liability as follows:

> [When] the shipment had been entrusted to a forwarder . . . who contracted to deliver the goods to the consignee at rates set by itself . . . the forwarder was subjected to common carrier liability for loss or damage whether it or an underlying carrier had been at fault. The fact that the forwarder did not own the carriers whose services it

---

[1] The statutory definition of a "freight forwarder" is:

> [A] person holding itself out to the general public (other than as an express, pipeline, rail, sleeping car, motor, or water carrier) to provide transportation of property for compensation and in the ordinary course of its business -
> > (A) assembles and consolidates, or provides for assembling and consolidating, shipments and provides for break-bulk and distribution operations of the shipments;
> > (B) assumes responsibility for the transportation from the place of receipt to the place of destination; and
> > (C) uses for any part of the transportation a carrier subject to the jurisdiction of the Interstate Commerce Commission under subchapter I, II, or III of chapter 105 of this title.

49 U.S.C. 13102(8).

4

> utilized was held to be immaterial. Its undertaking was to deliver the
> shipment safely at the destination. Common carrier liability was the
> penalty for failure of fulfillment in that undertaking.

Chicago, 336 U.S. at 484-85. One of the purposes of the Carmack Amendment was to codify those

common law principles into a uniform federal standard for liability. Id.

Thus, the Carmack Amendment provides a straightforward remedy for a shipper whose

freight has been damaged while under the oversight of a freight forwarder. The shipper may sue the

freight forwarder and recover for the full amount of the loss without having to ascertain which of the

common carriers used by the forwarder, most of whom the shipper has never communicated with,

damaged the shipper's freight. The issue before us, however, is whether a freight forwarder's

liability under the Carmack Amendment is exclusive.[2]

Central argues that, where a "freight forwarder" is utilized by a shipper to transport cargo,

the shipper's only remedy for lost or damaged freight is against the freight forwarder. Central relies

on the relationship between the first sentence of § 14706(a)(2), which states that "[a] freight

forwarder is both the receiving and delivering carrier," and the plain language of § 14706(a)(1),

which places liability for lost or damaged freight on either the carrier that issued the bill of lading

or the delivering carrier. Blending these provisions, Central argues that Accu-Spec may look to

Logistics Plus as the purported freight forwarder and that Central's dismissal, therefore, is

appropriate. For reasons discussed more fully below, we find no support for Central's argument in

either the statutory language or relevant caselaw.

First, we note that 49 U.C.C. § 14706 is completely silent as to whether a freight forwarder's

liability under the Carmack Amendment is exclusive, despite the presence of several elaborate

provisions describing the relative liabilities and responsibilities of common carriers and forwarders

in shipping. In short, if it was Congress' intent to restrict liability to freight forwarders in the manner

---

[2]     It is disputed between the parties whether Logistics Plus is or acted as a freight
forwarder in the course of the underlying shipping transaction. However, because
we conclude that the liability of a freight forwarder under the Carmack
Amendment is not exclusive, *infra*, we need not resolve that issue.

5

suggested by Central, it could have said so.  Indeed, although Section 14706(a)(1) is subtitled "motor carriers and freight forwarders," that provision does not differentiate between the two when discussing liability, noting only that both the carrier issuing the bill of lading "*and any other carrier that delivers the property*" are liable for damaged freight.  49 U.S.C. § 14706(a)(1) (emphasis added).

Moreover, the few courts that have confronted this issue have unanimously interpreted § 14706 as creating a cause of action for a shipper against both a freight forwarder *and* the underlying common carrier.  See, e.g., Gulf & Western Indus., Inc. v. Old Dominion Freight Line, Inc., 633 F.Supp. 688, 691-92 (M.D. N.C. 1986) (answering in the affirmative the "question [of] whether any action exists in favor of a customer of a freight forwarder against an underlying carrier upon whose line the goods were damaged."); Beautifax, Inc. v. Puerto Rico Marine Mgmt., 611 F.Supp. 537, 543 (D. Md. 1985) (concluding that both the freight forwarder *and* the common carrier who physically delivered damaged freight were proper defendants under the Carmack Amendment); Phoenix Assurance Co. v. K-Mart Corp., 977 F.Supp. 319, 324 (D.N.J. 1997) (noting that "an initial common carrier is liable to the shipper" and implying that "a 'freight forwarder' is *also* liable" under the Carmack Amendment) (emphasis added).  In Gulf & Western, the court relied upon the Supreme Court's opinion in Chicago to support this result:

> The Supreme Court in the Chicago case had occasion to discuss the relationships among customers, freight forwarders, and carriers.  The Supreme Court indicated that shippers by freight forwarder are "permitted to sue underlying carriers for loss or damage occasioned by the latter."  Regarding the nature of the freight forwarder's action, the Court stated: "[t]he theory of these actions was that the shipper is the undisclosed principal of its agent, the forwarder, in the latter's contract with the carrier."  Under this view of a customer-shipper's action, the customer would be bound by the terms of the carriage contract between the freight forwarder and the carrier.

Gulf & Western, 633 F.Supp. at 692 (quoting Chicago, 336 U.S. at 487 n. 27).  Thus, the caselaw and the clear language of the statute both refute Central's position.  Indeed, Central, through its counsel, conceded at oral argument that it was unaware of any caselaw supporting the proposition that a freight forwarder's liability under the Carmack Amendment is exclusive.  (See Transcript of Hearing on Defendant's Motion for Summary Judgment, pp. 15-16).

6

A few additional comments concerning the Supreme Court's opinion in <u>Chicago</u> are warranted.  In the course of discussing the applicability of the Carmack Amendment's subrogation provision to freight forwarders, the Court quoted a statement from Representative Wolverton, a member of the committee that drafted portions of the Carmack Amendment, indicating that the drafters may have intended the result that Central seeks:

> It should be understood that, in so far as a given service to its shipper is covered by the published rate of a freight forwarder, the latter is the only person to which such shipper is entitled to look for recovery of damages, and it is in this sense that the forwarder is to 'be deemed both the receiving and delivering transportation company.'

<u>Chicago</u>, 336 U.S. at 473 (quoting 87 Cong. Rec. 8220).  In light of the content of this statement, we must consider the appropriate weight and authority inhere in statements of legislative history and the propriety of resorting to such statements in the face of a clear statute.

In <u>Exxon Mobil Corp. v. Allapattah Services</u>, Inc., __ U.S. __, 125 S.Ct. 2611 (2005), the United States Supreme Court discussed the extent to which a resort to legislative history is appropriate in the face of an unambiguous statute.  The issue before the Court concerned whether a certain statutory provision abrogated the Court's previous decision in <u>Zahn v. International Paper Co.</u>, 414 U.S. 291 (1973).  The majority opinion relied upon the "plain text" of the statute and answered in the affirmative, while the dissent argued that the legislative history of the relevant statutory provision indicated that Congress did not intend to overrule <u>Zahn</u>.  <u>Exxon</u>, 125 S.Ct. at 2625.  Addressing this split, the majority criticized the dissent's extensive reliance on legislative history:

> The proponents of the alternative view of § 1367 insist that the statute is at least ambiguous and that we should look to other interpretive tools, including the legislative history of § 1367, which supposedly demonstrate Congress did not intend § 1367 to overrule <u>Zahn</u>.  We can reject this argument at the very outset simply because § 1367 is not ambiguous. For the reasons elaborated above, interpreting § 1367 to foreclose supplemental jurisdiction over plaintiffs in diversity cases who do not meet the minimum amount in controversy is inconsistent with the text, read in light of other statutory provisions and our established jurisprudence.
>
> *        *        *        *        *        *        *        *
>
> As we have repeatedly held, the authoritative statement is the

7

> statutory text, not the legislative history or any other extrinsic material. Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms. Not all extrinsic materials are reliable sources of insight into legislative understandings, however, and legislative history in particular is vulnerable to two serious criticisms. First, legislative history is itself often murky, ambiguous, and contradictory. Judicial investigation of legislative history has a tendency to become, to borrow Judge Leventhal's memorable phrase, an exercise in ""'looking over a crowd and picking out your friends.'"" See Wald, Some Observations on the Use of Legislative History in the 1981 Supreme Court Term, 68 Iowa L.Rev. 195, 214 (1983). Second, judicial reliance on legislative materials like committee reports, which are not themselves subject to the requirements of Article I, may give unrepresentative committee members--or, worse yet, unelected staffers and lobbyists--both the power and the incentive to attempt strategic manipulations of legislative history to secure results they were unable to achieve through the statutory text. We need not comment here on whether these problems are sufficiently prevalent to render legislative history inherently unreliable in all circumstances, a point on which Members of this Court have disagreed.

Exxon, 125 S.Ct. at 2625.

Similarly, we find no language in § 14706 to support the proposition, advanced by Central, that freight forwarder liability is exclusive. When statutory language is clear, courts should not resort to statements of legislative history and extrinsic  material, including those that create ambiguities or contradict the clear language of the statute. Id.

Furthermore, many of the concerns recognized by the Exxon majority also apply to Representative Wolverton's statements. For example, the Supreme Court's opinion in Chicago acknowledged the existence of a House Report that contradicted Representative Wolverton's statements, but the Court dismissed the Report as lacking credibility. See Chicago, 336 U.S. at 472-73.

Additionally, Representative Wolverton's statements appear to contain a fundamental misunderstanding of prior law. Representative Wolverton pronounced:

> If damage to a shipment occurs in the line of a common carrier whose services are being utilized by the forwarder, the forwarder has no right to subrogation [under the Carmack Amendment], since its own

8

shipper never had any right of action against such carrier.

87 Cong. Rec. 8220.  The Second Circuit Court of Appeals rejected Representative Wolverton's assertion that a forwarder had no right to subrogation under the Carmack Amendment as based on the faulty premise that a shipper never had a cause of action against an underlying carrier at common law.  See Acme Fast Freight v. Chicago, Milwaukee, St. Paul & Pac. R. Co., 166 F.2d 778, 783 n. 17 (2d Cir. 1948).  Although the Supreme Court reversed on the subrogation issue, the Court implicitly acknowledged Representative Wolverton's error, rejoining that "[o]f course shippers by freight forwarder have for many years been permitted to sue underlying carriers for loss or damage occasioned by the latter." Chicago, 336 U.S. at 487 n.27.

Finally, as discussed *supra*, we reiterate that those courts which have addressed this issue have unanimously held that a cause of action exists in favor of a shipper against both the freight forwarder and the underlying carrier under the Carmack Amendment.  See Old Dominion, 633 F.Supp. 688; Beautifax, 611 F.Supp. 537.  After coupling this unanimity with the Supreme Court's admonishment  that "the authoritative statement is the statutory text" and that "[n]ot all extrinsic materials are reliable sources," we decline to give significant weight to Representative Wolverton's statement.

Because we hold that a freight forwarder's liability under § 14706 of the Carmack Amendment is not exclusive, we need not determine whether Logistics is a freight forwarder within the meaning of the statute.  Under our interpretation, Central is an appropriate defendant in this action whether Logistics is a freight forwarder or an initial carrier.  Accordingly, Central's motion for summary judgment is denied as to Accu-Spec's claim under 49 U.S.C. § 14706.

**B.      49 U.S.C. § 14704**

Central also moves for summary judgment as to Accu-Spec's 49 U.S.C. § 14704 claim, asserting that this claim should be dismissed as lacking evidentiary and legal support.  Accu-Spec's brief in opposition did not oppose this argument.  Accordingly, Central's motion for summary judgment is granted as to this claim.  Count One of the complaint is hereby DISMISSED as to

9

Central.

### IV. Conclusion

An appropriate Order follows.

ACCU-SPEC ELECTRONIC SERVICES, )
INC., )
                 Plaintiff, )
  )
                v. )            Civil Action No. 03-394 Erie
  )
CENTRAL TRANSPORT )
INTERNATIONAL, *et al.*, )
  )
              Defendants. )

## **ORDER**

AND NOW, this 17th day of August, 2005, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that the Motion for Summary Judgment of Defendant Central Transport International [Doc. No. 15] is GRANTED as to Count One of the Complaint and DENIED as to Count Two of the Complaint.

                                   /s/ Sean J. McLaughlin
                                   United States District Judge

cm: All parties of record. ___

11