**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ACCU-SPEC ELECTRONIC SERVICES, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 03-394 Erie |
| | ) | |
| CENTRAL TRANSPORT INTERNATIONAL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

McLAUGHLIN, SEAN J.

Presently pending before the Court are the following post-trial motions filed by Plaintiff, Accu-Spec Electronic Services, Inc. ("Accu-Spec"): Plaintiff's motion for judgment as a matter of law, or, in the alternative, motion for a new trial; motion for prejudgment interest; and motion for reconsideration regarding cause of action under Section 14704.

### I. BACKGROUND

This case involves a claim for relief under the Carmack Amendment, 49 U.S.C. § 14704 and § 14706, stemming from physical damage sustained by an industrial x-ray machine while being shipped in interstate commerce. Accu-Spec was the shipper and owner of the x-ray machine, Defendant Logistics Plus, Inc. ("Logistics") was the freight forwarder of the shipment, and Defendant Central Transport International, Inc., was the motor carrier that damaged the equipment in transit.

This matter was tried before a jury commencing on October 17, 2005, and concluding on October 20, 2005. During the trial, Plaintiff introduced evidence of damages in the amount $47,521.84. Among the items of damage disputed by the Defendants was an inspection performed by a representative of the x-ray machine's manufacturer who had to be flown in from England at a cost of $2,150.82. At the conclusion of trial, jurors were provided with interrogatories to answer. The jury's responses to those interrogatories indicated that the jury did not find the cost of flying an inspector from England to be reasonable, but that the jury did find it reasonable for Plaintiff to ship the x-ray machine back to England for repairs. At the conclusion of the trial, the jury awarded a sum

1

of $21,000 to the Plaintiff, as evidenced by the juries' response to the following interrogatories:

6.      What amount, if any, is plaintiff entitled to recover from Central Transport?

        $  21,000.00

7.      What amount, if any, is plaintiff entitled to recover from Logistics Plus?

        $  21,000.00

In making its decision on damages, the jury was guided by the following instruction:

> If you find that Central Transport is liable, you must also find that Logistics is liable, and you must find them liable in the same amount, although there will only be one recovery.

## II. DISCUSSION

### A.     Motion for judgment as a matter of law

Plaintiff requests that this Court enter judgment as a matter of law in its favor in an amount of $45,371.02.  Citing the jurors answers to interrogatories, Plaintiff contends that this amount is proper because it constitutes the total amount of damages requested, $47,521.84, minus the amount the jury found to be unreasonable, $2,150.82.  Plaintiff argues that, because the jury found Defendants to be liable, and because Defendants did not challenge the nature or amount of the damages asserted by Plaintiffs other than $2,150.82, Plaintiff is entitled to the remaining amount claimed.

The question before the Court in a motion for judgment as a matter of law is whether the facts and inferences are such that no reasonable factfinder could have reached a verdict against the movant.  See Santos v. Sunrise Med., Inc., 351 F.3d 587, 590 (1st Cir. 2003).  In cases where the damage amount is uncertain, modification of a jury's damage award is appropriate only in the rarest circumstances, as the assessment of damages is "so peculiarly within the province of the jury that the Court should not alter it."  Dimick v. Schiedt, 293 U.S. 474, 480 (1935).  However, where the jury has found the underlying liability and there is no dispute as to damages, the trial court may adjust the damage award.  See, e.g., Liriano v. Hobart Corp., 170 F.3d 264, 272-73 (2nd Cir. 1999) (holding that federal courts have the ability to adjust a jury's damages award to account for an undisputed claim that was mistakenly omitted from the damages calculations); EEOC v. Massey Yardley Chrysler Plymouth, Inc., 117 F.3d 1244, 1252-53 (11th Cir. 1997) ("Courts recognize an exception to Dimick where the jury has found the underlying liability and there is no genuine issue

2

as to the correct amount of damages."); <u>Moreau v. Oppenheim</u>, 663 F.2d 1300, 1311 (5th Cir. 1981)

("The constitutional rule against additur ... is not violated in a case where the jury has properly

determined liability and there is no valid dispute as to the amount of damages.").

Here, there is no dispute as to the following damage claims and amounts:

       A) Repair Costs (Dage) - $36,312.00

       B) Shipping to England - $2,390.52

       C) Shipping to U.S. - $3,924.55

       D) Re-packing (NNN Carting) - $1,025.00

       E) Customs - $738.95

(Plaintiff's Exhibit 23).  At trial, after invoices reflecting these charges were entered into evidence,

Plaintiff's counsel elicited testimony from Earnest Carlson, the president of Accu-Spec, as to each:

> Q:    Repacking, this invoice from NNN Carting, is there an invoice in the package for that?
>
> A:    Yes, there is.
>
> Q:    Did Accu-Spec pay that sum of money to NNN Carting?
>
> A:    Yes, we did.
>
> Q:    Shipping to England.  Is there an invoice for shipping the equipment to England?
>
> A:    Yes.
>
> Q:    And who do we pay for that, by the way?
>
> A:    Logistics Plus.
>
> Q:    All right.  Did we pay it?
>
> A:    Yes, we did.
>
> Q:    The repair costs from Dage, $36,312, is there an invoice in the package for that?
>
> A:    Yes, there is.
>
> Q:    Did Accu-Spec pay that sum?
>
> A:    Yes, we did.
>
> Q:    The shipping back to the United States, $3,924.55, did

we pay for that, did Accu-Spec pay for that shipping?

A:    Yes, we did.

Q:    And then U.S. Customs, are there invoices for Customs in the package?

A:    Yes, there are.

Q:    And did Accu-Spec pay for those invoices or pay for those customs costs?

A:    Yes, we did.

*    *    *    *    *    *    ****

Q:    Why send the equipment back to the UK, why not investigate having it done, having it repaired in the United States?

A:    The equipment manufacturer, Dage, did not have facilities here in the U.S. to perform that kind of repair and inspection.  To send it anyplace else, other than Dage, would have voided our warranty with the machine.  And the third issue was that if the lead shield was compromised, we simply weren't going to put our employees at risk of taking a fatal dose of radiation.

(Trial Transcript, Day One, pp. 42-44).

Defense counsel, on cross-examination, questioned only the reasonableness of having an inspector from England flown to the United States:

Q:    Why didn't you send [the machine] back to England without spending $3,000 for Dunn to come and tell you that in person?

A:    We had to assess the damage.

Q:    Why couldn't it be done in England?

A:    We wanted to get an estimate of what the damages were going to be.

Q:    If the estimate was too high, were you going to send it to somewhere in the United States?

A:    No, sir.

Q:    What were you going to do with that information with respect to whether it was done in England or whether it was done in the United States?

A:    We wanted to see exactly where we stood dollar wise.

4

Q:     Could you have done that by just sending it to England and having them send you a letter that said $36,000?

A:     Probably could have been done.

Q:     Did you investigate the possibility of sending it to another manufacturer of X-ray equipment in the United States locally?

A:     Absolutely not.

Q:     You didn't look into it at all?

A:     No.

(Trial Transcript, Day One, pp. 56-57). Defense counsel did not, at any other point in the trial, attempt to question the reasonableness of the costs incurred in the actual repair of the X-ray machine. Indeed, at a pretrial conference, defense counsel conceded that they had no basis to do so:[1]

The Court:     If this thing goes to trial, are we going to spend a portion of the trial litigating the issue as to whether it was reasonable to spend - - I throw a figure out, to spend X amount today as to whether the repairs on the machine were reasonable?

Mr. Knox:      We will not, your Honor.

The Court:     How about you, Mr. Cohen?

Mr. Cohen:     I don't believe, I don't think we have a basis to challenge the reasonableness of the actual repair costs.
                        *     *     *     *     *     *     *     *     **

Mr. Delaney:   What I've heard from defendants answers the question, I believe, I just want to make it clear. I've arranged for video conference from the UK to your courtroom to get somebody to say reasonable, yes these were reasonable and necessary, I don't have to do that now - -

The Court:     I understand that repair costs - -

Mr. Cohen:     As to reasonable and necessary, you don't have to do that, reasonable and necessary.
                        *     *     *     *     *     *     *     *     **

The Court:     As I understand it, Mr. Cohen, one thing he's not going to have to put proof on, he's not going to have to put any experts on or testimony from other people to say that the shipment of the machine to England and the work they did on it in England was reasonable and necessary, is that right?

---

[1]     In this discussion, Mr. Knox represented Defendant Logistics Plus, Mr. Cohen represented Defendant Central Transport, and Mr. Delaney represented Plaintiff Accu-Spec.

       Mr. Cohen:    We have no way to contest labor or materials in England.

(Pretrial Conference Transcript, 10/12/05, pp. 29-34). Thus, while Defendants attempted to introduce evidence at trial disputing the reasonableness of having an inspector flown in from England and as to whether the machine needed to be shipped to England for repair, Defendants did not attempt to contest the $36,312.00 repair cost. Therefore, once the jury concluded, as it did, that Central and Logistics were liable to Accu-Spec for the damage to the machine, there was no basis for the jury not to award the undisputed amount incurred in repairing the machine.

       Moreover, although Defendants argued, albeit without evidentiary support, that the machine should have been repaired in the United States rather than in England, the jury disagreed. The fifth interrogatory to the jury read:

> Was it reasonable for the Plaintiff, after discovering that the cargo was damaged, to have the cargo shipped to England to be repaired?

(Jury Verdict, Dkt. #61, p.2). The jury checked the box indicating "Yes." We find that no reasonable factfinder, after concluding that this cost was reasonable, could have made the decision not to award the actual cost of shipping the machine to England and back.

       In sum, we find that the undisputed evidence at trial, the concessions by counsel for the defendants, and the explicit findings of the jury support an upwards adjustment of the damage award from the $21,000.00 awarded by the jury to a total of $44,391.02. Accordingly, Plaintiff's renewed motion for judgment as a matter of law is granted.

## B.    Motion for a new trial

       Pursuant to Federal Rule of Civil Procedure 50(c)(1), "If the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial." A district court may grant a new trial if required to prevent injustice or to correct a verdict that was against the weight of the evidence. See American Bearing Co., Inc. v. Litton Industries, Inc., 729 F.2d 943, 948 (3rd Cir.1984) (citing Thomas v. E.J. Korvette, Inc., 476 F.2d 471, 474-75 (3rd Cir.1974)). "The authority to grant a new trial, moreover, is confided almost entirely to the exercise of discretion on the part of the trial

court." Id. (quoting Allied Chemical Corp. v. Daiflon, Inc., 449 U.S. 33, 36 (1980) (per curiam)). In the exercise of that discretion, and in light of the foregoing discussion, we alternatively holds that Accu-Spec would be entitled to a new trial on the issue of damages in the event that our decision to grant the motion for judgment as a matter of law is reversed.

C.      **Second motion to reconsider as to Plaintiff's claim under 49 U.S.C. § 14704**

Accu-Spec, for the second time, asks us to reconsider our grant of summary judgment on Count 1 of Accu-Spec's complaint, brought under 49 U.S.C. § 14704.  A court may alter or amend a prior decision where the party seeking reconsideration can demonstrate: (1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the Court granted the motion for summary judgment; or (3) the need to correct a clear error of law or fact to prevent manifest injustice.  See Max's Seafood Café by Lou-Ann, Inc. v. Quntieros, 176 F.3d 669, 677 (3rd Cir. 1995).  As with their first motion to reconsider on this issue, Accu-Spec has not introduced any new evidence or cited any change in the controlling law such as to persuade us to reverse our prior ruling.  Thus, this motion is again denied.

D.      **Motion for prejudgment interest**

The parties do not dispute that an award of pre-judgment interest is allowable under the Carmack Amendment.  See American Nat. Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Systems, Inc., 325 F.3d 924, 936 (7th Cir. 2003).  Logistics Plus concedes that Accu-Spec is entitled to pre-judgment interest and disputes only the date from which interest should run. However, Central Transport disputes whether pre-judgment interest should be awarded at all in this case.

The purpose of pre-judgment interest is to compensate prevailing parties for the true costs of money damages incurred, and to promote settlement where liability and the amount of damages are not heavily disputed.  Skrevtvedt v. E.I. DuPont de Nemours, 372 F.3d 193, 206 and n. 18 (3rd. Cir. 2004).  "[P]rejudgment interest should ordinarily be granted unless exceptional or unusual circumstances exist making the award of interest inequitable."  Id. at 208.  Such "unusual circumstances" include "the claimant's bad faith, the claimant's assertion of frivolous claims, and

the claimant's repeated delay tactics." <u>U.S. ex rel. Bernard v. Casino Magic Corp</u>., 384 F.3d 510, 516 (8th Cir. 2004).

Here, the cost incurred by Accu-Spec was a liquidated amount, and there is no evidence of any bad faith or delay.  Indeed, Logistics Plus concedes Accu-Spec's entitlement to prejudgment interest, and Central, although they oppose an award of prejudgment interest, cites no caselaw.  Thus, in the exercise of our discretion, we grant Accu-Spec's request for an award of pre-judgment interest. In calculating the amount of interest due, the parties shall begin calculating interest on August 26, 2003, that date being 120 days from Accu-Spec's filing of an amended claim.

### IV. CONCLUSION

An appropriate Order follows.

ACCU-SPEC ELECTRONIC SERVICES,  )
INC.,                            )
                    Plaintiff,   )
                                 )
          v.                     )          Civil Action No. 03-394 Erie
                                 )
CENTRAL TRANSPORT               )
INTERNATIONAL, *et al.*,         )
                                 )
                   Defendants.   )

## ORDER

AND NOW, this 13th day of April, 2006, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Judgment as a Matter of Law is GRANTED and that, in the alternative, Plaintiff's Motion for a New Trial is GRANTED. Plaintiff's Motion for Pre-judgment Interest is GRANTED. Finally, Plaintiff's Motion for Reconsideration regarding cause of action under Section 14704 is DENIED.

                              /s/ Sean J. McLaughlin
                              United States District Judge

cm: All parties of record. ___

9